## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MICHAEL MINDEN, et al., | Case No.: 2:21-cv-00151-APG-BNW |
| Plaintiff | **Order (1) Granting in Part Allstate's Motion for a New Trial, Renewed Motion for Judgment as a Matter of Law, Remittitur, to Alter and Amend the Judgment, and Grant Relief from the Judgment; (2) Granting in Part Allstate's Objection to the Bill of Costs; and (3) Denying Allstate's Motion to Amend Judgment and Bill of Costs** |
| v. | |
| ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, | |
| Defendant | [ECF Nos. 245, 247, 248] |

On July 18, 2024, the jury returned a verdict for plaintiffs Michael and Theresa Minden on their breach of contract and bad faith claims. ECF No. 236. It awarded the Mindens $3,720,799.86 in compensatory damages for breach of contract, $4,242,400 in compensatory damages for bad faith, $622,095.79 in attorney's fees and costs as special damages for bad faith, and $21,212,000 in punitive damages. *Id.* Defendant Allstate Property and Casualty Insurance Company filed several post-trial motions for judgment as a matter of law, a new trial, remittitur, alteration and amendment of the judgment, and relief from the judgment. It also objects to the Mindens' bill of costs and moves to alter or amend the judgment to reduce fees and costs if I do not grant the other motions.

The parties are familiar with the facts, so I repeat them here only as necessary. I grant the motion for a new trial on the issues of breach of contract damages and punitive damages unless the Mindens agree to remittitur of the jury's awards. I grant in part the renewed motions for

judgment as a matter of law on the issue of attorney's fees and costs as special damages. I grant in part the objection to the bill of costs. I deny the motion to amend the judgment and bill of costs as moot. I deny all other post-trial motions.

## I.    LEGAL STANDARDS

### A.  Renewed Motions for Judgment as a Matter of Law

During trial, Allstate moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on bad faith, emotional distress damages, attorney's fees as special damages, and punitive damages. ECF Nos. 224; 227 at 71-72. Under Rule 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." I did not grant the Rule 50(a) motions, instead submitting the case to the jury. ECF No. 227 at 117-20.

Rule 50(b) provides that in this circumstance, a party may "file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." "Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "In ruling on the renewed motion," I "may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b).

"A renewed motion for judgment as a matter of law is properly granted only if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (simplified). I must uphold the jury's verdict

1  "if it is supported by substantial evidence, which is evidence adequate to support the jury's

2  conclusion, even if it is possible to draw a contrary conclusion." *Id.* (quotation omitted).  I may

3  not reweigh the evidence the jury considered and instead "simply ask whether the plaintiff has

4  presented sufficient evidence to support the jury's conclusion." *Id.*

5      **B.  Motion for a New Trial or Remittitur**

6      Rule 59(a)(1)(A) provides that following a jury verdict, I may grant a new trial "for any

7  reason for which a new trial has heretofore been granted in actions at law in federal court."  I

8  may grant a new trial if the verdict is "contrary to the clear weight of the evidence, is based upon

9  false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*,

10  481 F.3d 724, 729 (9th Cir. 2007) (quotation omitted).  "A new trial is necessary where it is

11  found that passion and prejudice tainted the jury's verdict." *Pershing Park Villas Homeowners*

12  *Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 905 (9th Cir. 2000), *as amended* (Aug. 11, 2000).

13  However, "the fact that a jury may have been outraged by the defendant's conduct to the point of

14  awarding excessive damages does not prove that its decision on liability was flawed." *Id.*

15  (simplified).  "Where is no evidence that passion and prejudice affected the liability finding,

16  remittitur is an appropriate method of reducing an excessive verdict." *Id.* (simplified).

17      A jury's award of damages should generally be upheld.  Three exceptions apply:

18  (1) where the amount is "grossly excessive or monstrous;" (2) where "the evidence clearly does

19  not support the damage award;" or (3) where the award could have been based only on

20  "speculation or guesswork." *See Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1216 (9th Cir.

21  1983) (simplified).  To remedy an excessive jury verdict, I may order remittitur or a new trial, at

22  the option of the party awarded damages. *Morgan v. Woessner*, 997 F.2d 1244, 1258-59 (9th Cir.

23  1993) (noting that option of a new trial is required under the Seventh Amendment).  The

prevailing party has the option of either submitting to a new trial or accepting a reduced damages amount that the trial judge considers justified based on the evidence. *See Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983); *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 65-66 (1966).  "A remittitur must reflect the maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014) (quotation omitted).

### C. Motion to Alter or Amend the Judgment

"A district court has considerable discretion when addressing motions to amend a judgment under Rule 59(e)." *Turner v. Burlington N. Santa Fe Ry. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003).  However, "a Rule 59(e) motion is an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) (quotation omitted).  I may grant Rule 59(e) relief on four grounds: "1) the motion is necessary to correct manifest errors of law or fact upon which the judgment is based; 2) the moving party presents newly discovered or previously unavailable evidence; 3) the motion is necessary to prevent manifest injustice; or 4) there is an intervening change in controlling law." *Turner*, 338 F.3d at 1063 (simplified).

## II.   ANALYSIS

Allstate renews its motions for judgment as a matter of law.  In the alternative, it requests a new trial on all issues, or remittitur of the compensatory and punitive damages awards.  In support, it argues the following:

(1) There is no evidentiary basis for the $3,720,799.86 the jury awarded the Mindens in compensatory damages for the breach of contract claim.  The jury misunderstood or purposely disregarded mandatory instructions to award either

4

the lesser of the diminution to the value of the house or the reasonable cost of repairs.

(2) There was insufficient evidence to support the Mindens' bad faith claim.

(3) Even if there was substantial evidence to support the bad faith claim, there was insufficient evidence to support the jury's award of emotional distress damages arising from bad faith.

(4) The Mindens' counsel made inflammatory statements during closing arguments that led the jury to, out of passion and prejudice, award excessive compensatory damages for breach of contract, find bad faith, and award punitive damages.

(5) The $21,212,000 punitive damages award is excessive and violates due process.

I address each of these arguments in turn.

**A. The jury's award for the breach of contract compensatory damages impermissibly gives the Mindens a windfall.**

Allstate argues that it is entitled to a new trial because there is no basis in the evidence to support the jury's compensatory damages award for the breach of contract claim. It contends that the jury did not follow the mandatory instruction that if it chose to award compensatory damages for the Mindens' breach of contract claim, it could only award the lesser of (1) the diminution to the value of the Mindens' home or (2) the reasonable cost of repairs. It contends that the jury's award of $3,720,799.86, which exceeds the amount of both figures combined, indicates that the jury misunderstood or disregarded the instruction, thus undermining the reliability of all its findings. The Mindens counter that the jury was instructed only to consider awarding the lesser of the two figures but was not required to do so. Allstate replies that the jury

instructions mandated awarding the lesser of the two figures because it specified that the jury

"should consider" awarding the lesser of the two figures if they awarded damages.

The jury instructions stated:

> If you find for the Mindens on their breach of contract claim, you must also determine the amount of the Mindens' damages. These damages are the amount of money that will reasonably and fairly compensate the Mindens for any injury you find was caused by Allstate. . . .
>
> In determining how much, if any, damages to award you should consider:
>
> - The amount that would reasonably compensate the Mindens for any loss of personal property;
>
> - The amount that would reasonably compensate the Mindens for any loss of use of any damaged property during the time reasonably required for its repair or replacement; and
>
> - The lesser of the following two options:
>
>   o The reasonable cost of necessary repairs to restore the property to the condition before the damaging incident *plus* the difference between the fair market value of the property immediately before the damaging incident and the fair market value after it is repaired; **or**
>
>   o The difference between the fair market value of the property immediately before the damaging incident and the fair market value of the unrepaired property immediately after the damaging incident. . . .

ECF Nos. 233 at 26-27; 234 at 25.

During trial, the Mindens presented evidence that one estimate for the total cost of repairs

to the Minden house was $482,655.43. Trial Ex. 26; ECF No. 222 at 108, 116.[1]  Michael Minden

---

[1] During closing arguments, the Mindens' counsel referred to Exhibit 26 as the "reasonable cost of necessary repairs to restore the property to the condition before the damaging incident." ECF No. 233 at 73-74, 93-94.

testified that the insured value of the home prior to damage was $2.9 million, and that it would be worth $9 million after repairs if it was in pristine condition, which it was not. ECF Nos. 216 at 27-33; 219 at 24-32.  Michael thus testified to a $6.5 million diminution in value, but he requested about half of that, $3.2 million. ECF No. 219 at 31-32.  The jury awarded the Mindens $3,720,799.86 in damages for the breach of contract claim. ECF No. 236 at 1-2.  This is greater than either the requested amount for diminution to the value of the Mindens' home or the reasonable cost of repairs, but it approximates the sum of the two figures.[2]  Thus, there is insufficient evidence to support the jury's damages as either the diminution to the value of the property or the cost of repairs. *See Blanton*, 721 F.2d at 1216.  Even if the cost of repairs was anywhere close to $3.7 million, there would still be insufficient evidence to support the award, as Michael testified to a request of $3.2 million for the cost of the diminution in value to the property, and the jury's award of $3,720,799.86 does not correspond to the lesser of the two figures that the jury was instructed to award.

While Allstate stresses that the jury instructions stated that the jury "should consider" limiting compensatory damages for the breach of contract claim to the lesser of the diminution of value or the reasonable cost of repairs, the language did not actually require that the jury do so. Unlike the words "shall" or "must," the word "should" does not command or mandate the jury when used in an instruction.  Should is "used to express what is probable or expected." *United*

---

[2] The reasonable cost of repairs supported by the evidence totals $482,655.43. Trial Ex. 26.  The jury's breach of contract award was $3,720,799.86.  Assuming that the jury arrived at this figure by adding up the diminution of value to the property (which Michael testified as being $6 million but requested $3.2 million) and the reasonable cost of repairs, this indicates that the jury calculated the reasonable cost of repairs as $520,799.86.  Thus, there appears to be a difference of $38,144.43 between the jury's calculation of the cost of repairs, and the cost of repairs supported by the evidence.  Regardless, the jury's compensatory damages award is still insufficiently supported by the evidence.

*States v. Redman*, 35 F.3d 437, 441 n.3 (9th Cir. 1994) (quotation omitted).  But, when a jury

"instruction use[s] the term 'should,'" the instruction is "permissive rather than mandatory."

*United States v. Caruto*, 663 F.3d 394, 399 (9th Cir. 2011) (quotation omitted); *see also United*

*States v. McCoy*, No. 96-10109, 107 F.3d 18, 1997 WL 43422, at *2 (9th Cir. Jan. 29, 1997)

("'Should,' unlike 'shall' or 'must,' is simply not mandatory.").

Nevertheless, the record indicates that the parties understood and intended the

instructions to limit the jury to award only the lesser of the two figures.  Exemplifying this,

counsel for the Mindens told the jury during closing arguments:

> You have to give the lesser of. . . . You can't give both.  You're
> not allowed to.  And you're not even allowed to give the greater of.
> You gotta do this analysis and pick the lesser of . . . [t]he
> reasonable cost of necessary repairs . . . . [or] the difference
> between the fair market value of the property immediately before
> the damaging event and the fair market value after it's repaired. . . .
> And if you think the loss in the value if the home isn't fixed is less,
> then you gotta do that one because you've gotta pick the lesser
> one.

ECF No. 233 at 93-95.

The parties' understanding is consistent with Nevada law that an award of contract

damages amounting to a double recovery or a windfall is improper. *See Colorado Env'ts, Inc. v.*

*Valley Grading Corp.*, 779 P.2d 80, 84-85 (Nev. 1989) (ruling that plaintiffs were not entitled to

recover an award of both lost profits and equipment standby damages because that would have

placed the plaintiff in a better position than if the defendant had performed); *see also W. Techs.,*

*Inc., v. All-Am. Golf Ctr., Inc.*, 139 P.3d 858, 860 (Nev. 2006) (noting that contract principles

seek to prevent double or excess recovery).  On at least one occasion, the Supreme Court of

Nevada has vacated a lower court's compensatory damages award that went "beyond

compensating [the plaintiff] for the injuries actually suffered, . . . instead afford[ing] him a

1  significant windfall." *Mitchell v. Nype*, No. 80693, 517 P.3d 905, 2022 WL 4482024, at *3 (Nev.

2  Sep. 23, 2022).

3        Allstate does not argue for a specific remittitur amount supported by the evidence.  The

4  Mindens presented evidence that the reasonable cost of repairs was $482,655.43, and Michael

5  requested $3.2 million for diminution of value to the property.  The lesser of the two figures is

6  the cost of repairs.  Thus, the maximum award supported by the evidence and arguments at trial,

7  the jury instructions, and Nevada law is the cost of repairs.  Accordingly, I grant Allstate's

8  motion for a new trial on breach of contract damages unless the Mindens agree to remittitur in

9  the amount of $482,655.43.

10  **B.  Substantial evidence supports the jury's finding of compensatory and special**

11  **damages for bad faith.**

12        **i.      Substantial evidence supports the jury's finding of bad faith.**

13        Allstate renews its motion for judgment as a matter of law on the jury's finding of bad

14  faith and related damages, arguing that there was insufficient evidence to support the jury's

15  finding.  Alternatively, it argues that even if there was evidence of bad faith, I should still grant a

16  new trial because the jury's verdict could not actually have been based on that limited evidence

17  and was instead prejudiced by evidence of the dispute over the roof repairs.  The Mindens

18  counter that there was substantial evidence of Allstate acting in bad faith, including that the

19  company unreasonably concluded their insurance claim before it conducted an adequate

20  investigation, that it suspended this claim in retaliation after the Mindens hired a lawyer, and that

21  it unreasonably delayed payment.  Allstate replies that notwithstanding the fact the Mindens have

22  never previously argued that Allstate retaliated against the Mindens after they sought legal

23  counsel, the Mindens' actions or inactions caused the temporary closures of the insurance claim.

1   "Nevada law recognizes the existence of an implied covenant of good faith and fair

2   dealing in every contract." *Pemberton v. Farmers Ins. Exch.*, 858 P.2d 380, 382 (Nev. 1993).

3   Breach of this covenant by insurers constitutes bad faith and gives rise to a claim in tort. *Id.* at

4   380; *United States Fid. & Guar. Co. v. Peterson*, 540 P.2d 1070, 1071 (Nev. 1975).  An insurer

5   breaches the duty of good faith when it refuses "without proper cause to compensate its insured

6   for a loss covered by the policy." *U.S. Fid. & Guar. Co. v. Peterson,* 540 P.2d 1070, 1071 (Nev.

7   1975).  An insurer is without proper cause to deny a claim when it has an "actual or implied

8   awareness" that no reasonable basis exists to deny the claim.  *Am. Excess Ins. Co. v. MGM

9   Grand Hotels, Inc.*, 729 P.2d 1352, 1354 (Nev. 1986).  An unreasonable delay in payment can

10  also constitute bad faith. *Guar. Nat. Ins. Co. v. Potter*, 912 P.2d 267, 272 (Nev. 1996) ("[T]his

11  court has addressed an insurer's breach of the implied covenant of good faith and fair dealing as

12  the unreasonable denial or delay of payment of a valid claim.").

13      Where the undisputed evidence shows that the insurer had some reasonable basis for

14  acting as it did, there is no bad faith. *Igartua v. Mid-Century Ins. Co.*, 262 F. Supp. 3d 1050,

15  1054 (D. Nev. 2017).  For example, an "insurer does not act in bad faith merely because it

16  disagrees with the claimant's estimation of his injuries or delays paying out benefits until it

17  receives relevant documents or expert opinions." *Id.* at 1053, 1055 (ruling that the insurer acted

18  reasonably when handling an insured's claim despite delaying payment for several years because

19  there was a reasonable dispute about the extent of the insured's injuries and whether those

20  injuries were caused by the accident).  "The quality of the insurer's investigation may be

21  evidence of an insurer's knowledge or reckless disregard as to the reasonableness of its denial"

22  of a claim. *Kingham v. State Farm Mut. Auto. Ins. Co.*, No. 2:15-cv-01555-APG-GWF, 2017

23  WL 4350973, at *2 (D. Nev. Sept. 28, 2017).  Although allegations of investigatory failures are

relevant to a bad faith denial of an insurance claim, "the failure to investigate is not itself bad faith." *Pioneer Chlor Alkali Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 863 F. Supp. 1237, 1249 (D. Nev. 1994); *see also WFTLVO1, LLC v. AmTrust N. Am., Inc.*, 636 F. Supp. 3d 1217, 1224 (D. Nev. 2022).

Here, there is substantial evidence of Allstate's unreasonable delay in payment to support the jury's finding of bad faith. Allstate's representative testified that once Allstate knew it owed the Mindens coverage, it had to promptly issue payment regardless of whether the Mindens agreed with the amount. ECF No. 222 at 59-63. The representative related how Allstate knew it owed the Mindens $2,887.56 following the initial inspection that Allstate's claims adjuster, Adam Chavez, made in November 2019, but did not send any payment until June 2020. *See id.* at 54, 59-63, 74, 80. Additionally, there is evidence that Allstate knowingly and unreasonably delayed additional payments for interior damage mitigation and remediation until September 2022, despite knowing that covered damages to the Mindens' home exceeded the first check amount of $2,887.56. Allstate's representatives testified that Allstate knew that it owed the Mindens coverage for the interior restoration and mold remediation related to the loss before sending the first check in June 2020 but did not acknowledge that it owed additional amounts until September 2022. *See* ECF Nos. 221 at 29, 50, 75-78; 222 at 54-55, 74-75, 81-85, 107-08.

Although Allstate argues that these delays stemmed from a good faith coverage dispute, the Mindens presented evidence at trial that nothing in the Mindens' policy stated that coverage for the interior damage was conditioned on the reasons Allstate gave for the delays in issuing payment, such as a requirement to wait until the work was complete. *See* ECF No. 222 at 78-80. Moreover, although Allstate's claim service leader, Luis de Leon Diaz, testified that the "industry standard" was to issue payment on completion of the work, he also testified that

1  Allstate acknowledged owing the Mindens over $29,000 in interior damage remediation and

2  repair in 2022 without actually knowing if the work was complete, only assuming that was the

3  case. *Id.* at 82-85.  While Chavez's coverage analysis noted that the ultimate coverage decision

4  was pending further inspection to determine the cause of damage, a reasonable jury could have

5  found that Michael Minden fulfilled this requirement when he hired Prestige Roofing to inspect

6  and obtained an estimate, as Chavez told the Mindens that they could hire their own inspector for

7  this purpose. ECF No. 216 at 66.  Finally, the Mindens presented evidence that Allstate never

8  told the Mindens that it would pay more than the first check for $2,887.56, nor did it instruct the

9  Mindens on what they needed to do to receive further payment. *See* ECF No. 221 at 38, 76-78,

10  80-83.  Because there is substantial evidence to support the jury's finding of bad faith arising

11  from unreasonable delays in payment, I deny Allstate's renewed motion as a matter of law on

12  this claim.[3]

13          **ii.      Substantial evidence supports the jury's finding of emotional distress**

14                   **damages arising from bad faith.**

15          Allstate renews its motion for judgment as a matter of law on the jury's award of

16  emotional distress damages, arguing there was insufficient evidence of attendant physical

17  symptoms required to establish an emotional distress claim under Nevada law.  The Mindens

18  counter that they do not have to present evidence of physical symptoms because that requirement

19  only applies to claims for intentional or negligent infliction of emotional distress (IIED/NIED),

20  and Nevada law does not require it to recover compensatory damages for emotional distress

21

22  _____

23  [3] As there was substantial evidence to support the jury's bad faith finding based on Allstate's
    unreasonable delay in payment, I do not address the Mindens' argument that Allstate
    unreasonably denied their claim after they sought to hire legal counsel, or Allstate's argument
    that the jury must have impermissibly based its verdict on evidence of the roof dispute.

arising from bad faith.  Allstate replies that Nevada law requires evidence of physical symptoms for a party seeking to recover any kind of emotional distress damages.

In *Farmers Home Mutual Insurance Company v. Fiscus*, an insurance bad faith case, the Supreme Court of Nevada ruled that the lower court properly awarded compensatory damages for "anxiety, worry, mental and emotional distress" without evidence of physical symptoms. 725 P.2d 234, 236 (Nev. 1986).  The court noted that the lower court could have reasonably concluded that the plaintiffs suffered compensable emotional distress from the insurer's bad faith denial of their home repair claim and the insured's testimony of subsequent emotional suffering, even without the "support of medical testimony, medical records, prescriptions or independent witnesses." *Id.*

This contrasts with the requirement for establishing standalone claims for emotional distress, including IIED and NIED, both of which require that a plaintiff set forth "objectively verifiable indicia" of the severity of emotional distress. *Miller v. Jones*, 970 P.2d 571, 577 (Nev. 1998) (noting requirement for IIED claims); *State, Dep't of Transp. v. Hill*, 963 P.2d 480, 483 (Nev. 1998), *overruled on other grounds by Grotts v. Zahner*, 989 P.2d 415, 416 (Nev. 1999) (noting requirement for physical manifestations of emotional distress in NIED claims).  In *Franchise Tax Bd. of State of California v. Hyatt*, the Supreme Court of Nevada noted this distinction between the requirements for compensatory damages for emotional distress arising from a bad faith claim versus an IIED claim.  There, the court stated that "[w]hile not specifically addressing an IIED claim, the *Fiscus* court addressed the recovery of damages for mental and emotional distress that arose from an insurance company's unfair settlement practices" and "conclud[ed] that [testimony of losing their personal possessions, having their home rendered unhabitable, and having no money to repair their home because their claim was

13

1  rejected] was sufficient to prove that plaintiffs had suffered mental and emotional distress." 407

2  P.3d 717, 741-42 (Nev. 2017), *rev'd and remanded sub nom. on other grounds by Franchise Tax*

3  *Bd. of California v. Hyatt*, 587 U.S. 230 (2019).  The *Franchise Tax Board* opinion noted that

4  *Fiscus* "rejected the insurance company's argument that there was insufficient proof of mental

5  and emotional distress because there was no medical evidence or independent witness

6  testimony." *Id.*

7       Thus, the Mindens were not required to present evidence of physical symptoms to

8  recover compensatory damages for emotional distress arising from Allstate's bad faith.  During

9  the trial, the Mindens testified that they experienced emotional distress, including stress, anxiety,

10 and sleeplessness, because Allstate's delays in payment prevented them from making necessary

11 repairs to their home for an extended period. ECF Nos. 219 at 33-34; 226 at 46-49, 68.  David

12 Merrill of J&J Construction also testified to observing the Mindens' stress. ECF No. 227 at 63.

13 The record thus supports the jury's finding of non-economic compensatory damages for

14 emotional distress arising from bad faith.  I therefore deny Allstate's renewed motion for

15 judgment as a matter of law.

16       **iii.    The jury was precluded from awarding attorney's fees and costs as**

17       **special damages as a matter of law.**

18       Allstate renews its motion for judgment as a matter of law on the jury's award of

19 attorneys' fees and costs.  It argues that fees and costs are precluded as special damages for bad

20 faith unless litigation was absolutely necessary for the Mindens to vindicate their rights, based on

21 *Sandy Valley Associates v. Sky Ranch Estates Owners Association* and its progeny. 35 P.3d 964

22 (Nev. 2001) (per curiam), *receded from on other grounds by Horgan v. Felton*, 170 P.3d 982

23 (Nev. 2007) (en banc).  Allstate contends it was still investigating the Mindens' claim at the time

they initiated the lawsuit, and they sued prematurely because the contractual time limitation for

them to sue Allstate is tolled while an investigation is ongoing.  Allstate argues that litigation

was therefore not absolutely necessary to vindicate the Mindens' rights, thus precluding the jury

from awarding the special damages as a matter of law.  It also argues that evidence the Mindens

presented regarding the rationale and timing of their lawsuit was prejudicial.

The Mindens respond that litigation was absolutely necessary because Allstate left them

with no choice but to sue when it inadequately conducted its investigation and delayed payments.

They also stress that their policy with Allstate expressly stated that there was a one-year time

limit for suing Allstate before forfeiting their right to do so, and that no provision indicated that

an ongoing investigation would toll that deadline.  They further contend that evidence about their

filing the lawsuit was not prejudicial, and that Allstate had the opportunity to object to it at trial

but chose to not do so.

"Nevada adheres to the American Rule that attorney fees may only be awarded when

authorized by statute, rule, or agreement." *Pardee Homes of Nevada v. Wolfram*, 444 P.3d 423,

426 (Nev. 2019).  There are a few, specific circumstances where parties may recover attorney's

fees as special damages.  But "the mere fact that a party was forced to file or defend a lawsuit is

insufficient to support an award of attorney fees as [special] damages." *Sandy Valley Assocs*., 35

P.3d at 969-70.  Rather, a party can request attorney's fees as special damages when:  (1) "it has

incurred attorney fees as foreseeable damages arising from tortious conduct or a breach of

contract;"  (2) the "plaintiff becomes involved in a third-party legal dispute as a result of a

breach of contract or tortious conduct by the defendant;" or (3) the plaintiff "incurred the fees in

recover real or personal property acquired through the wrongful conduct of the defendant or in

clarifying or removing a cloud upon the title to property." *Id.*; *see also Liu v. Christopher*

1  *Homes, LLC*, 321 P.3d 875, 880 (Nev. 2014) (holding that "a party to a contract may recover

2  from a breaching party the attorney fees that arise from the breach that caused the former party to

3  accrue attorney fees in defending himself or herself against a third party's legal action").

4         In *Pardee Homes*, the Supreme Court of Nevada "disavowed" any reading of *Sandy*

5  *Valley* that would "broadly allow attorney fees as special damages whenever the fees were a

6  reasonably foreseeable consequence of injurious conduct." 444 P.3d at 426.  *Pardee Homes*

7  clarified that Nevada law "does not support an award of attorney fees as special damages where a

8  plaintiff merely seeks to recover fees incurred for prosecuting a breach-of-contract action against

9  a breaching defendant." *Id.*  The court later added that a party's ability to recover attorney's fees

10 as special damages is limited "to instances where attorney fees were incurred because, as a result

11 of the defendant's intentional efforts, the plaintiff had no other choice but to litigate," and

12 "litigation is absolutely necessary to vindicate the party's rights." *Mitchell*, 2022 WL 4482024, at

13 *4.  For example, attorney's fees are allowable as special damages only in slander of title actions

14 rather than all cloud on title actions because "the defendant by intentional and calculated action

15 leaves the plaintiff with only one course of action: that is, litigation." *Horgan*, 170 P.3d at 988

16 (simplified).

17        Here, the Mindens are not entitled to attorney's fees as special damages because litigation

18 was not absolutely necessary as a matter of law to vindicate their rights at the time they filed suit.

19 The Mindens argue that they had no other choice but to sue Allstate because their policy states

20 that any suits against Allstate must be "commenced within one year after the inception of the loss

21 or damage." ECF Nos. 215 at 18-19; 222 at 130; 245 at 16.  But in Nevada this type of policy

22 limitation period is "tolled from the time [an insured] gave notice of the loss until [the insurer]

23 formally denies liability." *Clark v. Truck Ins. Exch.*, 598 P.2d 628, 629 (Nev. 1979).  Although

1  the Mindens argue that they were never informed of this exception, they do not point to any

2  authority holding that Allstate was legally obligated to inform them about this law.

3        The Mindens also argue that Allstate had "concluded" and "suspended" their claim, so

4  the one-year period was running.  But Allstate had not formally denied coverage at the time the

5  Mindens filed suit, and the suspensions of the claim were either requested by the Mindens or

6  temporary. *See* ECF Nos. 216 at 100-01, 103, 123; 221 at 32.  Allstate's claim history review

7  notes show that in December 2019, Michael Minden requested to suspend his claim until after

8  the holidays. ECF No. 221 at 20, 55.  Allstate also sent the Mindens a letter in late January 2020

9  that it was temporarily suspending their claim. ECF Nos. 216 at 108; 221 at 25-26, 32.  Allstate

10  resumed its investigation and assessment throughout early 2020, and Jonathan Bourne, Allstate's

11  representative, reopened the claim in June 2020. ECF No. 216 at 127-129.  And in closing

12  argument at trial, the Mindens' counsel stated that "[t]o this day[,] [Allstate has] never said that

13  coverage is denied, ever." ECF No. 233 at 75.

14         Even though Allstate had never formally denied their claim, the Mindens sued Allstate

15  in August 2020. ECF No. 1-1 at 11.  At that time, Allstate's investigation was still ongoing, and

16  the Mindens were not otherwise compelled to sue.  The Mindens therefore initiated litigation

17  without it being absolutely necessary to vindicate their rights, and the jury was precluded from

18  awarding the Mindens attorney's fees as special damages for bad faith as a matter of law.

19        *Sandy Valley* and subsequent cases do not specifically address litigation costs as special

20  damages, and the Supreme Court of Nevada has not directly addressed the issue.  However, like

21  attorney's fees, parties cannot incur litigation costs unless they initiate litigation.  Consequently,

22

23

1  I predict[4] that if confronted with this issue, the Supreme Court of Nevada would apply the same

2  rationale to costs as it has to attorney's fees.  Accordingly, the jury was also precluded from

3  awarding the Mindens litigation costs as special damages for bad faith.  I therefore grant

4  Allstate's renewed motion for judgment as matter of law and vacate the jury's award of

5  attorney's fees and costs as special damages for bad faith.  Accordingly, I deny as moot

6  Allstate's motion to alter or amend the judgment to vacate the jury's award of attorney's fees and

7  litigation costs.

8  **C. The Mindens must accept remittitur for punitive damages or opt for a new trial.**

9       **i.      Substantial evidence supports the jury's finding of punitive damages for**

10              **bad faith.**

11      Allstate argues that the jury erroneously awarded punitive damages for bad faith because

12  there was insufficient evidence to support the bad faith claim.  As I discussed above, there was

13  substantial evidence of Allstate's unreasonable delays in payment to support the jury's bad faith

14  finding.  Thus, I deny Allstate's renewed motion on this basis.

15      **ii.     Due Process requires reduction of the Mindens' punitive damages award.**

16      Allstate argues that even if evidence supports the bad faith claim, the jury's 5:1 ratio

17  between punitive damages and compensatory damages is excessive and thus violates its due

18  process rights.  It suggests that a 1:1 ratio would be more appropriate.  The Mindens do not

19  dispute that the jury used a 5:1 ratio in awarding punitive damages but argue that the ratio does

20  not exceed constitutional limits because the Supreme Court has never adopted a bright-line rule

21

22

---

23  [4] "When the state's highest court has not squarely addressed an issue, [I] must predict how the
    highest state court would decide the issue using intermediate appellate court decisions, decisions
    from other jurisdictions, statutes, treatises and restatements for guidance." *All. for Prop. Rts. &
    Fiscal Resp. v. City of Idaho Falls*, 742 F.3d 1100, 1102 (9th Cir. 2013) (quotation omitted).

1  for an impermissible multiplier for a punitive damages award.  They stress that under the factors

2  outlined in *State Farm Mut. Auto. Ins. Co. v. Campbell*, Allstate's actions justify a 5:1 ratio. 538

3  U.S. 408, 419 (2003).  Allstate replies that the *State Farm* factors lean in their favor and do not

4  support a 5:1 ratio.

5       When considering the constitutionality of a punitive damages award, I consider three

6  guideposts: "the degree of the defendant's reprehensibility or culpability, the relationship

7  between the penalty and the harm to the victim caused by the defendant's actions, and the

8  sanctions imposed in other cases for comparable misconduct." *Cooper Indus., Inc. v. Leatherman*

9  *Tool Grp., Inc.*, 532 U.S. 424, 435 (2001) (simplified).

10       **a.  Allstate's conduct was reprehensible, but not to a high degree.**

11       The reprehensibility of the defendant's conduct is the most important guidepost. *State*

12  *Farm*, 538 U.S. at 419.  To evaluate reprehensibility, I consider whether:

13       the harm caused was physical as opposed to economic; the tortious conduct
         evinced an indifference to or a reckless disregard of the health or safety of others;
14       the target of the conduct had financial vulnerability; the conduct involved
         repeated actions or was an isolated incident; and the harm was the result of
15       intentional malice, trickery, or deceit, or mere accident.

16  *Id.*  "It should be presumed [that] a plaintiff has been made whole for his injuries by

17  compensatory damages, so punitive damages should only be awarded if the defendant's

18  culpability, after having paid compensatory damages, is so reprehensible as to warrant the

19  imposition of further sanctions to achieve punishment or deterrence." *Id.*

20       Here, Allstate's actions were somewhat reprehensible.  The harm Allstate caused was

21  predominantly economic rather than physical.  While the Mindens testified to their emotional

22  distress, their evidence focused primarily on the economic impact of Allstate's delayed payments

23

1    that prevented them from repairing their home in a timely manner. *See* ECF Nos. 215 at 4-29;

2    216 at 54-131.

3        The Mindens were not financially vulnerable. To the contrary, they operated a successful

4    jewelry business that allowed them to "maintain a comfortable lifestyle," owned valuable

5    property, and testified to taking the family on an expensive vacation during the relevant time

6    period. ECF Nos. 216 at 14-15, 21; 219 at 68. I understand that "this is a case [between] a large

7    corporation and [a couple]—not two corporations on equal footing." *Hardeman v. Monsanto Co.*,

8    997 F.3d 941, 973 (9th Cir. 2021). And I note that Michael testified that he could not pay for

9    repairs to the roof without selling jewelry from his business at a significant discount. ECF No.

10   215 at 15-17. However, what is typically recognized as financial vulnerability in this context is

11   of a greater degree or severity, to an extent that fundamentally undermines or challenges an

12   individual's quality of life. *See, e.g., Merrick v. Paul Revere Life Ins. Co.*, 594 F. Supp. 2d 1168,

13   1186-87 (D. Nev. 2008) (noting disability, illness, familial obligations, complete loss of home,

14   welfare status, and bankruptcy status as examples of financial vulnerability). Moreover, there

15   was no evidence of other markers that have sometimes been recognized as financial

16   vulnerability, such as when a defendant's tortious actions target a plaintiff's livelihood. *See, e.g.,*

17   *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949,

18   958 (9th Cir. 2005) (noting that the plaintiff-physicians were financially vulnerable because

19   "their livelihoods depended upon their practices" which the defendants intentionally targeted).

20       The remaining factors evince at least some degree of reprehensibility that may justify a

21   higher punitive damages award. The unreasonable delays in payment demonstrated an

22   indifference to the Mindens' health and safety. Allstate claims adjuster Adam Chavez inspected

23   and documented the significant roof damage and resulting damage to the interior of the home.

The damaged roof left the interior exposed to more flooding and required tarping to temporarily cover the hole.  Michael testified that Chavez told him that Allstate would send specialists who would inspect the roof, protect the affected areas from further damage, and mitigate interior water damage. ECF No. 216 at 62-64.  Shortly thereafter, water that had accumulated in the ceiling infiltrated the interior and caused additional damage and leaking into the house. *Id.* at 70. Moreover, the specialists sent by Allstate to assist in remediating the interior damage told Michael that they could not do additional work beyond setting up dehumidifiers until Allstate approved their bid. *Id.* at 78.

In the subsequent months, Michael contacted Chavez multiple times, including regarding the ineffective tarping of the roof.  But Allstate did not issue payment for repairs that it knew it owed the Mindens, nor send specialists to examine the roof and the damaged interior of the house as it promised, until June 2020. *Id.* at 79-90; ECF No. 229 at 9-10.  It was not until nearly seven months after the Mindens filed their insurance claim that Allstate's representative first informed Michael that he was responsible for repairing the roof to protect the interior of his house and remain in compliance with his policy. ECF No. 215 at 12-13.  During this time, the Mindens' residence remained significantly damaged and vulnerable to additional flooding, with mold and other interior damage remaining unaddressed.  Allstate's unreasonable delays in payment demonstrated at least some indifference to the Mindens' health and safety.

There was also evidence that Allstate intentionally and repeatedly delayed payment that it knew it owed to the Mindens.  By November 2019, Allstate had determined that it owed the Mindens a minimum of $2,887.56, but it did not send payment until June 2020.  Allstate also delayed payment after knowing that it owed the Mindens additional coverage for interior damage remediation and mold mitigation.  While Allstate argues that the delays were part of a good faith

1    dispute over coverage, Allstate's representatives testified that once Allstate determined payment

2    was due to the insured, it was required to make prompt payment.  Thus, at least on two

3    occasions, Allstate knew that the Mindens were owed coverage but unreasonably delayed

4    payment.

5         While Allstate's actions demonstrated some level of reprehensibility, they do not display

6    the same magnitude of severity as other examples of conduct that have been classified as highly

7    reprehensible. *See, e.g., Merrick*, 594 F. Supp. 2d at 1185 (noting highly reprehensible conduct

8    of an insurance company characterized by "obtain[ing] [profits] at the expense of physically,

9    mentally, emotionally, and economically vulnerable individuals, through repeated actions

10   systematically applied to deprive them of disability insurance benefits in their time of need . . .

11   for an extended period of time").

12              **b.  The 5:1 ratio of punitive to compensatory damages exceeds**

13                   **constitutional limits.**

14        Although the Supreme Court has "been reluctant to identify concrete constitutional limits

15   on the ratio between harm . . . to the plaintiff and the punitive damages award," it has observed

16   that, "in practice, few awards exceeding a single-digit ratio . . . will satisfy due process." *State*

17   *Farm*, 538 U.S. at 425.  Even "an award of more than four times the amount of compensatory

18   damages might be close to the line of constitutional impropriety." *Id.*  "In cases where there are

19   significant economic damages and punitive damages are warranted but behavior is not

20   particularly egregious, a ratio of up to 4 to 1 serves as a good proxy for the limits of

21   constitutionality." *Planned Parenthood of Columbia/Willamette Inc.*, 422 F.3d at 962 (citing

22   *State Farm*, 538 U.S. at 425).  A higher punitive damages award may be justified in cases in

23

1    which "reprehensibility [is] especially high and the compensatory award [is] relatively low."

2    *Riley v. Volkswagen Grp. of Am.*, 51 F.4th 896, 902-03 (9th Cir. 2022).

3        Here, Allstate's conduct caused significant economic damage but was not particularly

4    egregious for the reasons outlined above.  Moreover, the $4,242,400 compensatory award for

5    bad faith is substantial, so this is not a case where a relatively low compensatory award could

6    justify a higher punitive damages award or ratio. *See Bains LLC v. Arco Prod. Co., Div. of Atl.*

7    *Richfield Co.*, 405 F.3d 764, 776 (9th Cir. 2005) (characterizing a $50,000 award as substantial).

8    There is also a significant difference between this award and those imposed in other cases with a

9    comparable level of reprehensive conduct.[5]  When courts have affirmed larger punitive awards,

10   the defendants' behavior demonstrated a special degree of reprehensibility that is not present

11   here.[6]  Thus, the 5:1 ratio here is unconstitutionally excessive.

12                **c.  A substantial punitive damages award aligns with the civil penalties**

13                    **authorized by Nevada law for comparable conduct.**

14       "[A] reviewing court engaged in determining whether an award of punitive damages is

15   excessive should accord substantial deference to legislative judgments concerning appropriate

16   sanctions for the conduct at issue." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 583 (1996)

17   (quotation omitted).  Nevada's statutory cap on punitive damages does not apply to insurance

18

19

---

20   [5] *See, e.g.*, *In re USA Com. Mortg. Co.*, 802 F. Supp. 2d 1147, 1189 (D. Nev. 2011) (applying a
     maximum 1:1.2 compensatory damages to punitive damages ratio for bad faith, equaling
21   approximately $2.6 million to $3 million).

22   [6] *See Merrick*, 594 F. Supp. 2d at 1189-91 (ruling as constitutional (1) a $24 million punitive
     damages award for bad faith at an 8.18 to 1 ratio and (2) a $36 million punitive damages award
23   for bad faith at a 12.28 to 1 ratio because the defendants "deliberately targeted those who were
     physically, mentally, emotionally, and financially vulnerable" and "repeatedly subjected [the
     plaintiff] and thousands of others to their bad practices").

1  bad faith actions. *See* Nev. Rev. Stat. §§ 42.005(1)-(2)(b).  Thus, this factor weighs in favor of

2  the constitutional permissibility of a substantial punitive damages award.

3           **d.  Remittitur of the punitive award to a 1.5:1 ratio best serves the goals**

4                **of punishment and deterrence.**

5           As established above, the jury's punitive damages award of $21,212,000 was "neither

6  reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary

7  deprivation of [Allstate's] property." *State Farm*, 538 U.S. at 429.  When a district court rejects a

8  punitive damages award, it "should give the plaintiff the option of a remittitur or a new trial on

9  the punitive damage issue." *Morgan*, 997 F.2d at 1257.  While Allstate argues that no punitive

10  damages are warranted, the jury concluded otherwise, and I discussed above how the jury could

11  find that Allstate's actions were reprehensible.  For the reasons discussed above, this is a case

12  where "in light of the substantial compensatory damages awarded . . . a punitive damages award

13  at or near the amount of compensatory damages" is justified. *State Farm*, 538 U.S. at 429.  The

14  harm is predominantly economic and the compensatory damages award substantial, so a reduced

15  punitive damages award will more "reasonably serve the interest of punishment and deterrence"

16  and not offend constitutional requirements. *Planned Parenthood of Columbia/Willamette Inc.*,

17  422 F.3d at 963.

18         Thus, I find that $6,363,600 in punitive damages, equal to 1.5 times the Mindens'

19  compensatory damages award for bad faith is appropriate.  A 1.5 ratio between compensatory

20  and punitive damages is well within constitutional parameters.  I therefore grant the motion for a

21  new trial on punitive damages unless the Mindens agree to remittitur of the jury's award in the

22  amount of $6,363,600.  If the Mindens do not accept remittitur, a new trial must be held on the

23  issue of punitive damages.

1          **iii.    The Mindens' counsel's statements during closing argument did not taint**
2                    **the jury's verdict.**

3          Allstate argues that it is entitled to a new trial because the Mindens' counsel made
4    inappropriate comments during closing arguments appealing to the jury's passion and prejudice,
5    thus tainting the verdict on liability, compensatory damages, bad faith, attorney's fees, and
6    punitive damages.  These comments were that: (1) Allstate actively tried to hide its financial data
7    through the witnesses it designated for trial, (2) Allstate coached witnesses, (3) witnesses lied at
8    Allstate's direction, and (4) Allstate pays its claims department $4.5 billion to handle claims.
9    ECF No. 245 at 18.  Allstate also contends that opposing counsel ended his closing argument by
10   improperly "appealing to the jury to punish Allstate in an amount that says 'Do this right and
11   treat people the way you should treat people.'" *Id.* at 19 (citing ECF No. 233 at 148).

12         The Mindens do not dispute that their counsel made these comments, but they note that
13   Allstate did not contemporaneously object to the comments during the trial and seek curative
14   instructions or move for a mistrial.  They argue that this shows that the statements were not
15   harmful, and even if they were, Allstate waived its objections.  Alternatively, they contend that
16   the remarks were isolated and did not permeate the trial to rise to the level of improperly
17   impassioning and prejudicing the jury in reaching its verdict.  They also note that urging the jury
18   to "'[d]o this right and treat people the way you should treat people'" is a permissible argument
19   encouraging the jury to draw any reasonable inference from the evidence. ECF No. 260 at 36.
20   Allstate replies that it does not matter that it did not contemporaneously object because this is the
21   first chance it had to object to the excessive verdicts, which it argues were awarded because of
22   opposing counsel's comments.

23

"The federal courts erect a high threshold to claims of improper closing arguments in civil cases raised for the first time after trial." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) (simplified).  The standard is high because raising an objection before the jury begins deliberations allows me to "examine the alleged prejudice and to admonish counsel [] or issue a curative instruction" and "allowing a party to wait to raise the error until after the negative verdict encourages that party to sit silent in the face of claimed error." *Id.* (simplified). To determine whether improper closing arguments justify a new trial, I analyze "whether counsel's misconduct so permeated the trial as to lead to the conclusion [that] the jury was necessarily influenced by passion and prejudice in reaching its verdict." *Cooper v. Firestone Tire and Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir. 1991).  The Ninth Circuit has affirmed a district court's decision to deny granting a new trial when (1) "the alleged misconduct occurred only in the argument phase of the trial," (2) "the remarks were isolated rather than persistent," (3) "most of counsel's comments were not objected to at trial and [the party seeking a new trial] did not move for a mistrial at the end of argument." *Id.*

Here, the Mindens' counsel's statements do not warrant a new trial.  The Mindens do not dispute that the first four at issue (that (1) Allstate actively tried to hide its financial data by designation of witnesses, (2) Allstate coached witnesses, (3) witnesses lied by Allstate's direction, and (4) Allstate pays its claims department $4.5 billion to handle claims) were either false or not supported by any admissible evidence at trial.  However, reviewing the record, the comments occurred only in the argument phase of trial and were isolated rather than persistent. Allstate also raises these arguments for the first time, post-trial.  Allstate did not object to the statements during trial, request curative instructions, or move for a mistrial.  Although this may have been the first opportunity for Allstate to object to an excessive verdict, Allstate could have

1  objected to the comments at trial.  Allstate did not find the statements sufficiently improper to

2  object to them during trial, suggesting that the comments did not permeate the trial so as to

3  improperly impassion and prejudice the jury to the point of tainting its verdict. *Pershing Park*

4  *Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 905 (9th Cir. 2000), *as amended*

5  (Aug. 11, 2000) ("A new trial is necessary where it is found that passion and prejudice tainted

6  the jury's verdict.").

7      Similarly, the Mindens' counsel's comment that the jury should treat people a certain

8  way also does not justify a new trial given that it was in closing argument and "within the bounds

9  of fair advocacy." *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 520 (9th Cir. 2004); *see also*

10  *Montera v. Premier Nutrition Corp.*, 111 F.4th 1018, 1038 (9th Cir. 2024).  After all, "[u]sing

11  some degree of emotionally charged language during closing argument in a civil case is a well-

12  accepted tactic in American courtrooms." *Settlegoode*, 371 F.3d at 518; *Montera*, 111 F.4th at

13  1038.  Because Allstate has not met its burden to show that the comments improperly inflamed

14  the jury and tainted its verdict, I deny the motion for a new trial.

15      **D.  Federal, not state, law applies when awarding litigation costs.**

16      Allstate objects to the Mindens' bill of costs, arguing that many of the listed expenses are

17  not recoverable because they are non-taxable under 28 U.S.C. § 1920 and Local Rule 54, both of

18  which govern the award of costs in this case.  It concedes that courts in this district have

19  previously interpreted NRS §§ 18.020 and 18.005 as substantive rights to costs in diversity cases.

20  But it argues that the right to costs in those cases was part of the plaintiff's state law claim,

21  which is not the case here.

22      The Mindens counter that NRS § 18.020 controls because it is a substantive right.  They

23  note that courts in this district have often followed *Coker Equipment Co. v. Wittig*, where the

27

Ninth Circuit ruled that "[u]nder Nev. Rev. Stat. § 18.020, the prevailing party in an action alleging more than $2,500.00 in damages is entitled to recover costs as a matter of right." 366 Fed. App'x. 729, 733 (9th Cir. 2010).  Allstate replies that *Coker Equipment* is an unpublished case, and that the Ninth Circuit's more recent, published decision in *Casun Invest, A.G. v. Ponder* controls.  There the court held that a district court must apply 28 U.S.C. § 1920, not NRS § 18.020, when determining whether to award costs to the prevailing party. 119 F.4th 637, 648 (9th Cir. 2024*), cert. denied sub nom. NVWS Props., LLC v. Casun Inv., A.G.*, 145 S. Ct. 1927 (2025).

Under 28 U.S.C. § 1920, "a judge or clerk may tax" certain items as costs.  Federal Rule of Civil Procedure 54(d)(1) states that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party."  Rule 54(d)(1) creates a presumption that courts award costs to a prevailing party, but also "vests discretion in the district court to refuse to do so." *Berkla v. Corel Corp.*, 302 F.3d 909, 921 (9th Cir. 2002).  In contrast, under Nevada law "[c]osts must be allowed of course to the prevailing party against any adverse party against whom judgment is rendered . . . [in] an action for the recovery of money or damages, where the plaintiff seeks to recover more than $2,500." NRS § 18.020(3).  The word "must" denotes that I am required to award such costs if Nevada law applies.

*Coker Equipment Co. v. Wittig*, an unpublished case, states that under NRS § 18.020(3), "the prevailing party in an action alleging more than $2,500.00 in damages is entitled to recover all costs as a matter of right." 366 F. App'x at 733.  However, in *Casun Invest, A.G., v. Ponder*, a published case, the Ninth Circuit ruled that 28 U.S.C. § 1920, not NRS § 18.020(3), governs the scope of a district court's discretion on a motion to tax costs. 119 F.4th at 648.  While the

28

1 | Mindens argue that *Ponder* does not overrule *Wittig*, the latter case is an unpublished disposition

2 | that has no precedential value in this case. *See* Ninth Circuit Rule 36-3 ("Unpublished

3 | dispositions and orders of this Court are not precedent, except when relevant under the doctrine

4 | of law of the case or rules of claim preclusion or issue preclusion."). *See also Hart*, 266 F.3d at

5 | 1177-78. Thus, *Ponder* controls and 28 U.S.C. § 1920 governs the awarding of costs.

6 | **E.  Not all of the requested costs are taxable under 28 U.S.C. § 1920 and the Local**

7 | **Rules.**

8 | The Mindens requested $31,925.67 in litigation costs in addition to the $71,705.79 in

9 | costs included in the jury's attorney's fees award.  Allstate argues that under § 1920, only

10 | $6,567.07 of those expenses (clerk fees, trial binders/exhibits, and service of process fees) are

11 | taxable.  Specifically, it objects to (1) $8,580 in trial/technology support costs and (2) $10,902.10

12 | in trial expert witness fees. ECF Nos. 243 at 2-3; 247 at 3.  Allstate also objects to other costs the

13 | Mindens claimed in their bill of costs in the event I vacate the judgment, including:

14 | (1) $23,938.74 in deposition transcripts/reporter fees, (2) $2,796.34 in document

15 | production/Bates stamping costs, (3) $36,857.25 in additional expert fees, (4) $5,700 in

16 | mediation fees, and (5) $234.50 in hearing transcript fees. ECF No. 247 at 3-4.  In total, Allstate

17 | objects to $94,885.43 of the Mindens' bill of costs.  The Mindens do not make any

18 | counterarguments regarding which, if any, of these costs is taxable under § 1920.  Because I

19 | vacated the jury's award of attorney's fees and costs above, I address whether each of these

20 | disputed costs is taxable.

21 | **i.  Some of the trial and technology support costs, which involve**

22 | **exemplification, are taxable.**

23 |

29

The Mindens have requested $8,580 in trial/technology support costs. Neither § 1920 nor the local rules provide explicit guidance on whether such fees are taxable. As one district court in this circuit has noted, "[w]hether—and to what extent—the use of technology at trial is taxable as a prevailing party cost under 28 U.S.C. § 1920 is an evolving issue." *Fowler v. California Highway Patrol*, No. 13-cv-01026-TEH, 2014 WL 3965027, at *3 (N.D. Cal. Aug. 13, 2014). The Supreme Court has stressed that there is no "presumption in favor of the broadest possible reading of the costs enumerated in § 1920," and that taxable costs are limited by statute and are modest in scope. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012). The Court has "made clear that the discretion granted by Rule 54(d) is not a power to evade the specific categories of costs set forth by Congress." *Id.* at 572 (quotation omitted).

Under § 1920(4), "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case" are taxable. Exemplification includes "the act or process of showing or illustrating by example." *Kalitta Air L.L.C. v. Central Tex. Airborne Sys. Inc.*, 741 F.3d 955, 959 & n.4 (9th Cir. 2013) (per curiam) (quotation omitted) (affirming award of costs for "graphics consultants"); *see also Maxwell v. Hapag-Lloyd Aktiengesellschaft, Hamburg*, 862 F.2d 767, 770 (9th Cir. 1988) (stating that § 1920(4) "has been interpreted to include all types of demonstrative evidence, including photographs and graphic aids" and holding that "'exemplification and copies of papers' may under certain circumstances encompass illustrative materials if 'necessarily obtained for use in the case,' as § 1920 requires"). The Local Rules do not specify whether technology assistance falls under taxable costs for exemplification. *See* LR 54-6.

Here, the attached invoice lists services rendered related to trial preparation and trial support. These include:

(1) $390.00 for attending calls and meetings with the Mindens' counsel for equipment testing and trial protocols;

(2) $487.50 for downloading and reviewing exhibit databases for trial use and meeting with the Mindens' counsel regarding trial protocols;

(3) $780.00 for preparing photograph databases for opening arguments;

(4) $682.50 for preparing the opening presentation;

(5) $2,730.00 for meeting with the Mindens' counsel and preparing the opening presentation;

(6) $1,755.00 for providing trial support and preparing for witnesses; and

(7) $1,755.00 for trial support.

ECF No. 243-11. Expenses numbers 1-5 are arguably exemplification costs necessarily obtained for use in the case, including logistical and planning services that are part of the "act" or "process" of displaying visual elements or showing by example during trial. *Kalitta Air L.L.C.*, 741 F.3d at 959 n.4. Thus, they are taxable under § 1920(4). However, it is unclear from the descriptions if and how expense numbers 6 ("Trial; prepare for following day witnesses") and 7 ("Trial") relate to exemplification. Because expense numbers 6-7 would not clearly fall into any subcategory of taxable costs under § 1920 without further clarification of what those services entailed, I decline to award them. I therefore award the Mindens $5,070 in trial/technology support costs, constituting expense numbers 1-5. I decline to award the other $3,510.

### ii.   Trial expert fees are not taxable.

The Mindens make two requests for trial expert fees, one for $10,903.10 and another for $36,857.25, totaling $47,760.35. ECF Nos. 243-13; 243-6. Expert fees are generally not taxable, unless the expert was court appointed. 28 U.S.C. § 1920(6). *See also* LR 54-11(h) (stating that

1    expert witness fees are not ordinarily allowed).  Because these experts were not court-appointed,

2    the costs are not taxable, and I decline to award them.

###    iii.    Some of the requested deposition transcripts costs and reporter fees are taxable.

5    The Mindens request $23,938.74 in deposition transcripts costs and reporter fees. ECF

6    No. 243-2.  They note this figure does not include the fees for condensed transcripts which

7    appear on the invoice. ECF No. 262 at 6.  Under § 1920(2), "[f]ees for printed or electronically

8    recorded transcripts necessarily obtained for use in the case" may be taxed.  "Deposition costs

9    are taxable if they are reasonably necessary for trial." *Evanow v. M/V Neptune*, 163 F.3d 1108,

10    1118 (9th Cir. 1998).  Local Rule 54-4 further identifies taxable versus non-taxable deposition

11    costs.  It specifies that the "either the original [deposition transcript] or a copy, but not both" is

12    taxable. LR 54-4(a)(1).  It also states that a party may recover "[r]easonable costs of a deposition

13    reporter" and "[r]easonable costs for videography." LR 54-4(a)(2), (3).  Handling and delivery

14    fees, as well as "other special formatting or production of deposition transcripts" are not taxable.

15    LR 54-4(b)(2), (3).

16    Here, the Mindens seek costs for the depositions of: (1) Russell Thomas Romney;

17    (2) Theresa Minden; (3) Michael Minden; (4) Timothy Marshall; (5) Robert Bosek, Jr.;

18    (6) Marcor G. Platt; (7) Jonathan Bourne; (8) Peter S. Evans[7]; (9) Michael Gelb, (10) Marco

19    Rodriguez, (11) Peter Mendoza, (12) Adam Chavez[8]; (13) Daniel Merritt[9]; and (14) Luiz Diaz.

20    ECF No. 243-2.  Fees that are reasonably necessary to obtain the depositions, such as

21

22    [7] There were two parts to this deposition. ECF No. 243-2 at 16.

23    [8] There were two parts to this deposition. ECF No. 243-2 at 17.

[9] There was also a nonappearance fee. ECF No. 243-2 at 15.

witness/attendance and reporter fees, are taxable, and total to $1,530.[10]  The Mindens are also entitled to the cost of the original or a copy of deposition transcripts, but not both. LR 54-4.  The first line item of the invoices for Marshall, Bosek, Bourne, Evans (parts one and two), Rodriguez, Chavez (parts one and two) and Diaz reads as "original and 1 certified copy of transcript." ECF No. 243-2 at 5, 6, 8, 9, 11, 13, 16, 17, 18 (simplified).  Because this cost is a single line item that does not divide the amount between the original and copy of the transcript, and the Mindens are only entitled to the cost of one or the other, it is unclear how much of this expense is taxable.  Similarly, the deposition invoices for Romney, Theresa Minden, Michael Minden, Platt, Gelb, Mendoza, and Merritt include a single line item for "E-Transcript Email + PDF Formats (Full Size)," which does not specify whether the total cost includes both an original and a copy of a transcript. *Id.* at 2, 3, 4, 7, 10, 12, 19 (simplified).  Because the Mindens do not explain how the total line-item amount is allocated between the costs of the original and the copy of the transcript, I award one half: $7,694.15.

There are additional costs within the invoice that "appear to have been provided for the convenience of the attorneys" and were thus not necessary and are not taxable. *Daniel v. Ford Motor Co.*, Civ. No. 2:11-02890 WBS EFB, 2018 WL 1960653, at *4 (E.D. Cal. Apr. 26, 2018).[11]  The invoices for the depositions of Romney, Theresa Minden, Michael Minden, Platt, Gelb, Mendoza, and Merritt include line items for PDF email versions of (1) exhibits and (2) condensed transcripts.  While the Mindens noted that they did not include the charges for condensed transcripts, PDF email versions of exhibits are also specially formatted and produced

---

[10] These taxable costs include the reporters' charges for "Attendance – Half Day," "Attendance – Full Day," and "Hourly – After 5:00 pm." ECF No. 243-2 at 5, 6, 8, 11, 13, 16, 18.

[11] *See also Self v. FCA US LLC*, No. 1:17-cv-01107-SKO, 2019 WL 1994459, at *14 (E.D. Cal. May 6, 2019); *Durham v. FCA US LLC*, No. 2:17-cv-00596-JLT, 2020 WL 243115, at *14 (E.D. Cal. Jan. 16, 2020).

versions of deposition transcripts that are not taxable under LR 54-4(b)(2)-(3).  The depositions
of Marshall, Bosek, Bourne, Rodriguez, Chavez (parts one and two), and Diaz also feature line
items for (1) "Exhibits – b&w" and (2) "Exhibits – Color." ECF No. 343-2 at 5, 6, 8, 11, 13, 16,
18.  I assume these are charges for exhibits used during the depositions.  While LR 54-6 allows
for the cost of copies of exhibits attached to a filed document and trial exhibits, it is not clear
from the descriptions whether and which, if any, of the line items actually falls into either of
these categories.  Thus, I decline to award them.

The depositions of Marshall, Bosek, Bourne, Rodriguez, Chavez (parts 1 and 2), and Diaz
incurred other various charges for:(1) "Digital Litigation Package," (2) "Administration fee for
read and sign," (3) "Handling & Processing," (4) "Archiving Fee," (5) "Rough Draft," (6)
"Conference Room,"  (7) "Standard – 7 day Expedite," and (8) "Nonappearance of Daniel
Merritt." ECF No. 243-2 at 5, 6, 8, 11, 13, 15, 16, 18.  The "Administration fee for read and
sign," is a cost that is reasonably necessary. *See Evanow*, 163 F.3d at 1118.  The charge for
"Nonappearance of Daniel Merritt" qualifies as a "[r]easonable cost[] of a deposition reporter . . .
or other official presiding at the deposition." LR 54-4(a)(2).   However, charges for a "Digital
Litigation Package" and "7 day Expedite" "appear to have been provided for the convenience of
the attorney" and not necessary to obtain the depositions. *See Daniel*, 2018 WL 1960653, at *4.
"Handling & Processing" fees are also not taxable under LR 54-4(b)(2).  The Mindens do not
provide a description for what "Archiving fees" and "Rough Draft" are, let alone a basis for
which they would qualify as taxable costs.  Thus, I assume both fall into the "special formatting
or production" category and are not taxable under LR 54-4(b)(3).  Costs for a conference room
would also not be taxable as an "expense[] in arranging for taking a deposition." LR 54-4(b)(1).
Finally, the invoice includes additional, non-taxable "delivery and handling" fees for nine of the

depositions. ECF No. 243-2 at 20-28.  As these fees are not taxable under LR 54-4(b)(2-3), I decline to award them.

I therefore award the Mindens $9,809.80[12] in taxable deposition transcript costs and reporter fees.  I vacate the remaining nontaxable costs and fees.

### iv.   Document production and Bates-stamp costs are not taxable.

The Mindens request $2,796.34 in document production/Bates-stamp costs. ECF No. 243-3.  Neither § 1920 nor the Local Rules specify whether document production and Bates-Stamp costs are taxable.  The Mindens do not specify how these costs are separate from general office overhead fees, which are not ordinarily taxable under Local Rule 54-11(j).  I therefore decline to award the $2,796.34 in document production and Bates Stamp costs.

### v. Mediation fees are not taxable.

The Mindens request $5,700 in mediation fees. ECF No. 243-7.  These expenses are not taxable under § 1920 or the Local Rules.  Thus, I decline to award the $5,700 in mediation costs.

### vi.   Hearing transcript fees are not taxable.

The Mindens request $234.50 in hearing transcript fees. ECF No. 243-8.  As I noted above, under § 1920, I may tax costs for "transcripts necessarily obtained for use in the case," as well as for printing, witnesses, and other expenses and costs.  However, LR 54-3 provides that "[t]he cost of transcripts of pretrial, trial, and post-trial proceedings is not taxable unless the transcripts are (1) requested by the court or (2) prepared under a stipulation approved by the court.  Mere acceptance of the transcripts by the court does not constitute a request."

---

[12] This is the sum of the costs for (1) reasonable witness/attendance and reporter fees ($1,530); (2) either the original or copy of a deposition transcript ($7,694.15); (3) the charges for "Administration fee for read and sign" ($150 total for six depositions) (ECF No. 243-3 at 5, 8, 11, 13, 16, 18); and (4) the charge for "Nonappearance of Daniel Merritt" ($435.65) (*Id.* at 15).

There was no order directing the production of hearing transcripts, nor any court approved stipulation for hearing transcripts. I therefore decline to award the $234.50 in hearing transcript fees.

As detailed above, I award the Mindens the following taxable litigation costs:

1. $5,070.00 in trial/technology support costs; and

2. $9,809.80 in taxable deposition transcripts costs and reporter fees.

**TOTAL: $14,879.80**

**III.    CONCLUSION**

I THEREFORE ORDER that Allstate's motion for a new trial, renewed motion for judgment as a matter of law, remittitur, to alter and amend the judgment, and grant relief from the judgment **(ECF No. 245) is GRANTED in part** as set forth in this order. The Mindens have until October 3, 2025 to elect whether to accept a remittitur for the jury's award of (1) compensatory damages for breach of contract from $3,720,799.86 to $482,655.43 and (2) punitive damages from $21,212,000 to $6,363,600. The Mindens must opt for a new trial on any issue for which they decline remittitur.

I FURTHER ORDER that Allstate's objection to the bill of costs **(ECF No. 247) is GRANTED in part** as set forth in this order. I award the Mindens taxable costs of $14,879.80.

I FURTHER ORDER that Allstate's motion to alter or amend the judgment to reduce fees and costs **(ECF No. 248) is DENIED** as moot.

DATED this 3rd day of September, 2025.

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE